## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:16-CR-136-MOC-WCM-1

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UILFRIDO LOPEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. No. 33). Having considered Defendant's motion, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following findings, conclusions, and Order denying Defendant's motion.

## FINDINGS AND CONCLUSIONS

### I.    FACTUAL AND PROCEDURAL BACKGROUND

In August 2015, federal, state, and local law enforcement agencies conducted Operation "Edneyville Express" under the leadership of the Organized Crime Drug Enforcement Task Force ("OCDETF"). The long-term investigation led to several indictments of various crystal methamphetamine ("meth") traffickers who were part of an extensive distribution network in the Western District of North Carolina. One of the remaining targets of OCDETF Operation "Edneyville Express" in August of 2015 was Jesus Calderon, also known as "Chewy," who resided in the Western District and reportedly received shipments of crystal meth from associates in the Los Angeles, California area.

On August 28, 2015, Postal Inspector Teresa Cabrera of the United States Postal Inspection Service ("USPIS") and members of the Los Angeles Sheriff Department's Parcel and Cargo Narcotics Enforcement Team ("LASD PACNET") at Los Angeles International Airport ("LAX"), including Detectives McBride, Logrecco, Tagaloa, and Sergeant Nava, conducted a routine random parcel profiling at the airport. Two parcels were flagged as suspect. They bore the same sender and recipient information, leading investigators to suspect that they contained contraband that had to be broken up and sent in multiple packages. Inspector Cabrera checked the return address of 368 Chestnut St., Saluda, NC 28773 and found that the address did not exist.

Inspector Cabrera checked the intended recipient's address of 5004 E. 59 P., Apt. E, Maywood, CA 90270 and found that, while the address did exist, it was not associated with the intended recipient Defendant Uilfrido Lopez. Detective McBride's narcotic detection canine JerryLee conducted a separate and independent exam of each parcel and gave a positive alert to each parcel, indicating the presence of a narcotic odor emanating from each parcel. The return addressee was listed as Jesus Calderon—believed to be a reference to Calderon—on each parcel.

Inspector Cabrera and the investigators from LASD PACNET then went to the intended recipient's address in Maywood, California to conduct a knock and talk. As Detective Logrecco approached the door to the residence, he noticed that there was a surveillance camera next to the front door and advised the other investigators of what he observed. Detective Logrecco knocked and Defendant answered the door. Defendant admitted he was "Lopez."

Detective Logrecco asked Defendant for his identification. Defendant went to retrieve his identification but left the front door open, allowing Detective Logrecco to observe a UPS box in the residence's hallway. Defendant returned to the front door of the residence and presented a

Mexico Consulate card to verify his name. Detective Logrecco asked Defendant if the investigators could enter the residence to speak to him about the two parcels they intercepted earlier that day at LAX. Defendant consented to investigators entering his residence to speak with him about the two parcels. Inspector Cabrera noticed in plain view a money counter on top of a safe in the living room, four heat-sealed bags containing U.S. currency next to the safe, and two rolls of plastic wrap.

Inspector Cabrera also noticed that there were surveillance cameras next to the U.S. currency and in the kitchen of the residence. Detective Logrecco told Defendant to be honest and that, based on what investigators observed in the residence, they believed that there was money in the intercepted parcels. Defendant admitted that each of the parcels contained U.S. currency. Defendant initially claimed the parcels were mailed to him and that he was supposed to count out the money. Once he collected $300,000, he would make a call and someone would pick the money up from him.

Defendant admitted that he collected $300,000 in the past and that a "Mexican" picked it up. Inspector Cabrera asked Defendant for consent to search the parcels to verify their contents. Defendant consented to a search of the parcels orally and in writing. The written Consent to Search form, which was in English and Spanish, acknowledged that Defendant had been informed of his constitutional rights not to have a search made of the parcels without a search warrant and his right to refuse consent to search the parcels; that he understood his right to withdraw his consent; and that his consent was being given freely and voluntarily, and without threats, promises, or coercion. (Gov't Ex. A).

Investigators opened the parcels and confirmed that they contained U.S. currency. One

parcel contained $70,000 in U.S. currency, and the other parcel contained $40,000 in U.S. currency. The $70,000 parcel was packaged in the following manner: 5 vacuum-sealed bags (each containing 7 bundles of U.S. currency in rubber bands); inside a food saver bag wrapped in black tape, foil, plastic wrap, auto grease, plastic, carbon paper, plastic wrap, carbon paper, plastic wrap, another food saver bag, two layers of plastic wrap, and shipping tape. The $40,000 parcel was packaged in the following manner: a food saver bag containing 4 bundles of U.S. currency in rubber bands, wrapped in plastic wrap, carbon paper, auto grease, black tape, pepper, more plastic wrap, inside a vacuum sealed bag, and wrapped in more plastic wrap. The packaging of each—especially the use of foil, carbon paper, pepper, and auto grease—indicated that steps were taken to prevent discovery of the money by a narcotics detection canine.

Defendant, who was never handcuffed during his interaction with investigators at his residence, admitted he had been accepting parcels containing money for the past several months. Defendant admitted that he received a 4% commission as payment for accepting the parcels. Defendant was asked if there were any drugs in the residence. Defendant denied that there were any drugs in the residence and said the investigators could check the residence. Defendant signed a consent form allowing investigators to search his residence. Detective McBride ran JerryLee through the residence. JerryLee alerted to the 4 heat-sealed bags of U.S. currency, indicating that the odor of narcotics was emanating from the bags of money.

During the ensuing search, investigators located a backpack containing the mailing receipt for the seized parcels, leading investigators to suspect that not only was Defendant going to receive the seized parcels, but that he also sent them from North Carolina. Defendant, upon investigators finding the receipt, admitted that he had flown to North Carolina, was given the money, and that he then packaged the parcels himself and mailed them to California.

Inspector Cabrera asked Defendant if his fingerprints would be on the inside of the parcels. Defendant responded "yes." The continuing search turned up packing materials, plastic wrap, boxes, a scale, and labels and receipts from other parcels that were sent. When asked, Defendant would not explain why the materials were in his residence. When asked by Inspector Cabrera about the different names on the labels for other parcels, Defendant stated that he just makes up the names in order to mail the parcels.

Investigators also seized the 4 heat-sealed bags containing U.S. currency that they observed in the residence. Three bags (each containing 7 bundles of U.S. currency in rubber bands) and 1 bag (containing 6 bundles of U.S. currency in rubber bands) contained a total of $43,000 in U.S. currency. Defendant disclaimed the money seized by signing a Disclaimer of Ownership form, which was in English and Spanish. (Gov't Ex. B). The form acknowledged Defendant was not the owner of the property seized; that there was probable cause that the property seized was acquired in violation of 21 U.S.C. § 841 (Distribution of Controlled Substances); that Defendant had no interest in the property seized; and that Defendant's statements were being made freely and voluntarily and that no promises, threats, or coercion had been used against him. Defendant provided a contact number that was the same contact number listed for the intended recipient on the labels for the parcels seized at LAX. Throughout their interactions with Defendant that day, investigators kept their weapons holstered, did not threaten Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Defendant told investigators that he lived in the residence with his girlfriend, Brenda Cabrera. As investigators were leaving the residence, they observed a vehicle pull into the parking spot for the residence. Inspector Cabrera approached the female driver and asked if she

was Brenda Cabrera. The driver confirmed that she was. When informed of the items seized from the residence and when asked if she had any interest in the property, Brenda explained that she recently broke up with Defendant and was just there to just pick up some glasses. Brenda also signed a Disclaimer of Ownership form, which was in English and Spanish. The form acknowledged that Brenda was not the owner of the property seized; that there was probable cause that the property seized was acquired in violation of 21 U.S.C. § 841 (Distribution of Controlled Substances); that Brenda had no interest in the property seized; and that Brenda's statements were being made freely and voluntarily and that no promises, threats, or coercion had been used against her. When Inspector Cabrera asked Brenda for a contact number for Defendant, Brenda provided a number that was the same contact number listed for the sender on the labels for the parcels seized at LAX. A narcotics detection canine conducted a separate and independent exam of each bag of U.S. currency seized from Defendant's residence later that same day and gave a positive alert to each bag, indicating the presence of a narcotic odor emanating from each bag.

On March 2, 2016, and March 3, 2016, investigators interviewed a known meth trafficker after his arrest as part of OCDETF Operation "Edneyville Express." The trafficker told investigators, among other things, that Jesus Calderon is the largest meth dealer in the area; that Calderon obtains his meth through parcels shipped via the U.S. Postal Service, Fed Ex, and UPS; and that he takes receipt generally at the post office in Flat Rock, North Carolina. The trafficker also described how a "money man" travels from California to the Hendersonville, North Carolina area approximately twice a month to meet with Calderon and retrieve narcotics proceeds. The trafficker described the "money man," and the description was similar to the known description for Defendant. The trafficker further explained that the "money man" normally flies to Charlotte

and then drives to the Hendersonville area by car; the "money man's" trips to North Carolina are short–arriving in and departing from the Hendersonville area the same day, or staying overnight at an area hotel or some cabins in the Saluda area (believed to be a reference to "Cabin Fever," which offers cabin rentals just off of Interstate 26 in Saluda, North Carolina); and the "money man" moves drug money for a living. Finally, the trafficker identified a dated picture of Defendant as potentially being the "money man."

On April 13, 2016, American Airlines notified investigators that Defendant purchased a ticket from Los Angeles, California to Charlotte, North Carolina, with Defendant departing Los Angeles on the evening of April 12, 2016, and arriving in Charlotte in the early morning hours of April 13, 2016. Special Agent Casey Drake of the North Carolina State Bureau of Investigation ("SBI") applied for and obtained an order from North Carolina Superior Court Judge Thomas Davis on April 13, 2016, authorizing the installation and monitoring of a pen register and/or trap and trace device on Defendant's known cellphone number, which appeared on the labels for the intercepted parcels and which Brenda gave to investigators as the contact number for Defendant. (Gov't Ex. C).

On April 14, 2016, investigators were attempting to locate Defendant using the trap and trace on Defendant's cellphone when his cellphone was detected at approximately 7:57 p.m. near "Cabin Fever," a complex of vacation rental cabins in Saluda, NC. An investigator went to that location but could not locate Defendant. By 10:00 p.m., Defendant's phone was detected near Charlotte-Douglas International Airport. Investigators knew that the last direct flight from Charlotte, North Carolina to Los Angeles, California that evening would be departing at 10:20 p.m. Defendant had an outstanding State warrant for his arrest out of Cleveland County, North Carolina.

Task Force Officer ("TFO") Aaron Lisenbee of the United States Drug Enforcement Administration ("DEA") enlisted the assistance of Homeland Security Investigations ("HSI") to locate and stop Defendant within the airport before he could board the plane. Special Agent Jason Allen of HSI determined that Defendant missed the flight and rescheduled his flight to LAX for the following morning.

On April 15, 2016, HSI Special Agent Mark Hammond, HSI TFO Nestor Cabarcus, who was also a Charlotte-Mecklenburg Police Department ("CMPD") Officer, and HSI TFO Todd Bradshaw, who is also a Pineville Police Canine Handler, conducted surveillance in the gate area of the LAX flight as it was preparing to board. Agent Hammond observed Defendant standing in line near the jet way. The investigators approached Defendant, confirmed his identity, and arrested him on the outstanding State warrant, placing him in handcuffs. Agent Hammond retrieved two suitcases that Defendant checked with the airline and then Defendant and his belongings were taken to the CMPD Airport Division office in the airport.

Defendant told the officers that he speaks and understands English. Agent Hammond told Defendant that TFO Cabarcus speaks Spanish and could assist him with any questions or statements he wishes to make. Defendant stated that he understood. Agent Hammond then advised Defendant of his Miranda rights verbally, and Defendant followed along on a pre-printed HSI Miranda form. (Gov't Ex. D). Defendant indicated that he understood his rights and wished to waive them in order to answer questions and make statements. Defendant then signed the waiver of rights portion of the Miranda form, in which Defendant acknowledged that he had his Miranda rights read and explained to him; that he fully understood his rights; that he was freely and voluntarily waiving those rights; and that he did so without threat or intimidation and without any promise of reward or immunity.

Defendant consented to a search of his carry-on and checked luggage. Before any search, TFO Bradshaw used his narcotics detection canine Rafa to conduct an open-air sniff of Defendant's bags. Rafa alerted to the presence of a narcotic odor emanating from the bags. A search of the checked luggage led to the seizure of $62,860 in U.S. currency. Two bundles of money were wrapped in cellophane and concealed inside a pair of shoes. Two additional bundles of money in bank bags were concealed in the liner of one of the pieces of luggage. An ion scan of the money bundles seized tested positive for traces of meth and cocaine. Investigators also located a drum magazine capable of holding 75 rounds of 7.62 caliber ammunition and a flash drive in Defendant's luggage.

Finally, investigators seized two Apple iPhones and an LG Tablet in Defendant's possession. Defendant consented to a search of the devices in writing. More specifically, Defendant signed a Department of Homeland Security Computer Forensics consent form consenting to the search of his devices. (Gov't Ex. E). As documented in the form, Defendant stated that he understands English, was able to communicate with investigators, that he read the form, that it was read to him, and that he understood it. In signing the form, Defendant acknowledged that he had been informed of his right to refuse to consent to the search, that any contraband or evidence found on the devices may be used against him in a court of law, and that he understood that he may withdraw his consent at any time for any reason.

In signing the form, Defendant also stated that he was consenting voluntarily and that he had not been threatened, placed under duress, or promised anything in exchange for his consent. Defendant, who was cooperative throughout his interactions with investigators, even provided investigators with the passwords for each device.

When questioned, Defendant stated that he was traveling to Los Angeles, California,

but that he lives in Mexicali, Mexico. Defendant explained that he traveled to Charlotte to pick up bags of money, but that he did not know how much money he was supposed to pick up. He stated that "Chewy" (believed to be a reference to Calderon) placed the money in his car the night before while his car was parked at the Airport Sheraton near Charlotte-Douglas International Airport.

Defendant further explained that he was supposed to be paid 4% of the money he was transporting and that he was to deliver the money to "Rosie" in Los Angeles. Defendant denied having any contact information for Rosie and claimed that she would call him after he arrived in Los Angeles to arrange for the delivery of the money. Defendant claimed that this was the first time he ever moved money between Chewy and Rosie. He stated that that "Ezekiel," who lives in Mexico, got him involved in moving money. Ezekiel approached him with the idea and gave him the money to pay for his airfare.

Defendant abandoned the money seized via a Department of Homeland Security Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise form. Throughout their interactions with Defendant, investigators kept Defendant handcuffed, except for removing or adjusting the handcuffs briefly to allow Defendant to sign documents. Investigators also kept their weapons holstered, did not threaten Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Defendant also consented to an interview that same day with DEA TFO Chris Morgan and Internal Revenue Service ("IRS") Special Agent Rob Key, who were involved in the larger investigation. Defendant changed some of the details of his earlier version of events. He explained to them that he flew out of LAX on April 12, 2016, and arrived in Charlotte, North Carolina on April 13, 2016. He paid cash for his plane ticket. He stated that "Ezekiel" tells him

when to travel to North Carolina to pick up money. Ezekiel tells him where to stay, how to pick up the money, and what to do with it once he gets back to Los Angeles. When he got back to Los Angeles this time, he was supposed to call "Rosa." Rosa would tell him what vehicle to put the money in at the Downey Mall near LAX. Then Defendant would travel to Mexico. Once in Mexico, he would receive a 4% commission on the amount of money picked up and delivered.

Regarding the current trip, Defendant explained that once he and his girlfriend, Victoria Hernandez-Ramos, got to Charlotte, they rented a car and drove to Saluda. Once there, they rented a cabin at "Cabin Fever." He left the rental vehicle unlocked overnight as instructed. "Chewy" (believed to be a reference to Calderon) dropped the money off in the early morning hours. Defendant confirmed the money was in the rental vehicle the next morning when he woke up, on April 14, 2016. Defendant and Hernandez-Ramos drove back to Charlotte later that day but missed their flight to LAX. They stayed overnight at the Sheraton and returned to the airport on April 15, 2016, to take the early flight to LAX. That is when he was stopped by HSI. Hernandez-Ramos boarded the plane and flew back to Los Angeles.

Defendant explained that he and his brother used to live in Laurel Park, North Carolina and worked in a local factory. Ezekiel used to have a driver with a tractor trailer that would deliver drugs to North Carolina. However, the driver was arrested in the Summer of 2015. Ezekiel then asked Defendant to travel to North Carolina to retrieve money. Defendant admitted that he knew the money he picked up, and was caught transporting, was drug proceeds. He also admitted that he knew what he was doing was illegal. Finally, Defendant acknowledged the earlier seizure in California, explaining that this was the second time he had money seized from him, with the first seizure taking place at his residence in California. Throughout their interactions with Defendant, the investigators kept their weapons holstered, made no threats to

11

Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Although Defendant consented to a search of his devices, including his cellphones, TFO Morgan sought and obtained a warrant from North Carolina Superior Court Judge Alan Thornburg on April 22, 2016, to search the devices. (Gov't Ex. F). When executing the warrant, investigators found photographs of large quantities of meth, marijuana, U.S. currency, firearms, and scales on one of Defendant's cellphones. Some of the photos were taken in Defendant's California residence.

Investigators found no evidence indicating that Defendant or Calderon had a legitimate reason to be dealing in large quantities of U.S. currency. North Carolina and California employment checks produced no record of employment for Defendant. Calderon reportedly worked at a local factory in Hendersonville, North Carolina in 2015 and/or 2016, but he had never earned more than $38,000 annually. A check of the bank account where Calderon's employment checks were deposited showed a single $20 withdrawal during a seven-month period, leading investigators to suspect that he was using money earned from his narcotics trafficking activities to pay his living expenses.

Defendant was indicted in this district on November 15, 2016, on one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) and two counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Defendant now moves to suppress the evidence seized and incriminating statements made by Defendant during the investigation. The Court held an evidentiary hearing on the suppression motion on October 4, 2021. This matter is ripe for disposition.

## II.     DISCUSSION

**A. The Government's Contention that Defendant Waived the Right to File a Suppression Motion**

The Government first contends that Defendant's motion to suppress is both untimely and waived. For the following reasons, the Court agrees.

Defendant first appeared in this district on March 3, 2017. "Under Rule 12 of the Federal Rules of Criminal Procedure, motions to suppress must be raised before trial or by the court-appointed deadline." See United States v. Chavez, 902 F.2d 259, 263 (4th Cir. 1990); Fed. R. Crim. P. 12(b)(3)(C), 12(c)(1). Defendant was arraigned with then-counsel Jason Hayes present on March 3, 2017. This Court's Standing Arraignment Order directed Defendant to file all pretrial motions in writing within 60 days from the date of the Arraignment Order. The Standing Arraignment Order warned Defendant that the Court would summarily deny untimely motions.

Defendant's trial was continued on March 13, 2017. (Doc. No. 12). As stated in the Bond Violation Report filed on April 28, 2017, (Doc. No. 13), the United States Pretrial Services Office advised the Court that Defendant reported to the United States Probation Office in Los Angeles, California for a meeting after his release in this district two days later than he was scheduled to report; Defendant failed to report for scheduled drug testing; and that, as of April 14, 2017, the probation officer in Los Angeles had not been able to contact Defendant via telephone, residence visits, or employment visits. More specifically, as the Bond Violation Report notes, Defendant had not updated the probation officer about his contact information and his whereabouts were unknown.

Defendant's then-counsel Jason Hayes filed a motion to continue trial on May 26, 2017, (Doc. No. 15), citing his inability to contact Defendant. The Court denied the motion on May 31, 2017, (Doc. No. 16) and ordered Defendant, having found that Defendant absconded

supervision, to personally appear at the docket call on June 5, 2017. Defendant failed to appear as directed at the docket call on June 5, 2017, and his bond was forfeited. The Pretrial Services Office filed an Addendum to the Bond Violation Report, citing Defendant's failure to appear for the docket call, and the Court issued an arrest warrant for Defendant. (Doc. Nos. 18, 19).

Defendant remained a fugitive until his arrest on April 18, 2021, in the District of Arizona. Once returned to this district, Defendant appeared for a bond violation hearing on June 11, 2021, and Defendant was detained at that time. Defendant filed the pending motion to suppress through counsel on July 12, 2021, more than four years after his arraignment.

Under Rule 12(c)(3), "the failure of the defendant to raise a motion to suppress prior to the time set by the court shall constitute waiver thereof," meaning that, as a general rule, a defendant "forfeits a suppression claim if that claim is not timely raised." See Chavez, 902 F.2d at 263; United States v. Ruhe, 191 F.3d 376, 386 (4th Cir. 1999); and FED. R. CRIM. P. 12(c)(3). However, the Court "for cause shown may grant relief from the waiver." See Chavez, 902 F.2d at 263; FED. R. CRIM. P. 12(c)(3) (referring to "good cause"). The Fourth Circuit recognizes that relief is generally denied where the motion to suppress was "fil[ed] after the court-imposed deadline, because of a dubious excuse." Id. Defendant clearly waived the right to file his suppression motion, given that he filed it more than four years after his arraignment, and Defendant has not established good cause to permit the Court to grant the defendant relief from the waiver. Thus, dismissal is appropriate on this basis alone. In any event, for the reasons stated below, Defendant's motion to suppress is alternatively denied on the merits.

**B. Merits of Defendant's Motion to Suppress**

As noted, Defendant gave statements on two separate dates, August 28, 2015, and April 15, 2016. In support of the motion to suppress, Defendant argues among other things that his

statements were coerced, involuntary, and in violation of his Fifth Amendment rights. For the following reasons, the Court disagrees.

   **1. Defendant's Statements on August 28, 2015**

   **a. Defendant's Argument that He Was Subject to Custodial Interrogation on August 28, 2015**

Defendant first argues that he was subjected to custodial interrogation in his residence on August 28, 2015, without first having been advised of his Miranda rights in violation of the Fifth Amendment. Defendant's argument is without merit.

The Fifth Amendment provides that "[n]o person. . .shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const., Amend. V. Miranda warnings protect the right against compelled self-incrimination from the "coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation." Berkemer v. McCarty, 468 U.S. 420, 428 (1984). To trigger Miranda, however, a suspect must either be taken into custody on a formal arrest or restrained of his freedom of movement to the degree associated with a formal arrest. Miranda v. Arizona, 384 U.S. 436 (1966); see also California v. Beheler, 463 U.S. 1121, 1125 (1983). However, Miranda warnings "are not required simply because. . . the questioned person is one whom the police suspect" committed a crime. Beheler, 463 U.S. at 1125.

The Fourth Circuit, applying the above principles, requires district courts to consider the "totality of the circumstances" and to make an "objective" inquiry, asking "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave," when determining whether an interrogation is custodial for purposes of Miranda. United States v. Azua-Rinconada, 914 F.3d 319, 325–26 (4th Cir. 2019). Stated another way, a court must ask "whether a reasonable man in the suspect's position would have understood his situation to be

one of custody." <u>United States v. Hashime</u>, 734 F.3d 278, 282 (4th Cir. 2013). As such, the subjective views "harbored by either the interrogating officers or the person being questioned are irrelevant." <u>Id.</u> at 285. Thus, there is "no consideration of the actual mindset of the particular suspect subjected to police questioning." <u>Id.</u> Relevant facts include, but are not limited to: the time, place, and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant. <u>Id.</u> at 283.

Here, Defendant was not subjected to custodial interrogation in his residence on August 28, 2015. First, there is no argument that Defendant was ever taken into custody on a formal arrest. The Court further finds that Defendant was not restrained of his freedom of movement to the degree associated with a formal arrest. Considering the totality of the circumstances, no reasonable person in Defendant's position would have understood his situation to be one of custody. The language, demeanor, and actions of the investigators when they were in Defendant's residence were calm and non-threatening. The tenor of the entire interaction between the investigators and Defendant remained conversational. No guns were drawn. No one was put on the ground. No one was handcuffed. No one was ordered to do anything. No one's freedom of movement was restrained. There was never any physical contact between investigators and Defendant. And no one was interrogated for hours on end in a confined space.

Defendants relies in part on <u>United States v. Hashime</u>, 734 F.3d 278, 282 (4th Cir. 2013), in arguing that the Court must grant the motion to suppress. Unlike here, however, in <u>Hashime</u> agents woke up the suspect in his bedroom at gun point; 15 to 30 state and federal agents occupied his residence; the agents initially ordered him and his out of the residence, and then

restricted their movements once they let them back, not allowing them to move unless under guard; agents denied the suspect's mother's request to lie down because she was recovering from brain surgery; agents kept the suspect isolated from his family; agents denied the suspect's mother's repeated requests for an attorney; and agents interrogated the suspect for hours in a small storage room in the basement of the residence, where he confessed to crimes involving child pornography. 734 F.3d at 280–81, 284–85. The Fourth Circuit in Hashime found that the suspect was in custody and that the questioning officers did not first advise the suspect of his Miranda rights. Here, the facts of this case are similar to Hashime only to the extent that the interaction between investigators and suspects took place in the suspects' residences, but that is where the similarity ends.

Defendant also relies on United States v. Chavira, 614 F.3d 127 (5th Cir. 2010), where the defendant was encountered by Customs and Border Protection as she attempted to gain entry to the United States via a pedestrian walkway at the El Paso, Texas port of entry, while accompanied by a minor she alleged to be her daughter. Id. at 129. A Customs and Border Protection officer briefly questioned her and asked her to provide birth certificates and identification for her and her alleged daughter. Id. Suspicious that Ms. Chavira was attempting to cross the border with a minor that was not her daughter, officers moved Ms. Chavira and the minor to a trailer in a secure area not accessible to the public and surrounded by a ten-foot fence. Id. at 129–30. Ms. Chavira and the minor were placed in separate rooms, Ms. Chavira was handcuffed to the chair she was seated in, Ms. Chavira was informed that she was being detained for questioning, and she was questioned for 30 to 40 minutes. Id. at 130, 134.

During the interrogation, Ms. Chavira admitted that she lied and that the minor was not in fact her daughter. Id. at 130. The officers did not advise Ms. Chavira of her Miranda rights until

after she confessed. Id. at 131. The Fifth Circuit found that Ms. Chavira's Fifth Amendment rights were violated when Customs and Border Protection questioned her at the secondary processing site without first advising her of her Miranda rights because the circumstances would have indicated to any "reasonable person in [Ms.] Chavira's situation that her freedom had been restrained to the degree associated with formal arrest." Id. at 134.

The facts in this case are simply unlike those in Chavira. Here, Defendant was not moved from his residence to another secure location not accessible by the public or moved within his residence to a confined location. Nor was he separated from anyone, handcuffed, or detained in anyway so that he could be questioned. Thus, Chavira simply does not support a finding that Defendant was subjected to a custodial interrogation.

Considering the totality of the circumstance, the Court finds that a reasonable person in Defendant's position would not have considered himself to be in custody on August 28, 2015. Thus, Defendant was not subject to a custodial interrogation in violation of his Miranda rights.

**b. Defendant's Argument that His Statements on August 28, 2015 Were Involuntary**

Defendant also argues that his confession on August 28, 2015 was involuntary. Defendant's argument is without merit.

The voluntariness of a defendant's confession "is to be determined from the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation marks omitted). The characteristics of the defendant and the interview or interrogation that a court should consider include "the youth of the accused. . .; his lack of education. . .; or his low intelligence. . .; the lack of any advice to the accused of his

constitutional rights. . .; the length of detention. . .; the repeated and prolonged nature of the questioning. . .; and the use of physical punishment such as the deprivation of food or sleep. . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (internal citations omitted). The question is "whether the defendant's will has been overborne or his capacity for determination critically impaired." Pelton, 835 F.2d at 1071. Stated another way, a defendant's confession is involuntary if it was "induced by such duress or coercion, express or implied, that the accused's will has been overborne and his capacity for self-determination critically impaired. . . and his statement was not the product of a rational intellect and a free will . . . ." United States v. Wertz, 625 F.2d 1128, 1133 (4th Cir. 1980) (internal quotation marks and internal citations omitted). In considering the factors in its voluntariness analysis, courts must remember the guiding principle that:

> none of these various factors is to be considered in isolation, nor may the determination rest solely upon any one circumstance, for it is significant that in all the decisions by the Supreme Court in which involuntariness was found, none of them turned on the presence or absence of a single controlling criterion; but each reflected a careful scrutiny of all the surrounding circumstances, looking to an assessment of the psychological impact on the accused of all those circumstances and an evaluation of how the accused reacted to them in arriving at a determination whether the accused's confession was induced by conduct and conditions that deprived his confession of voluntariness.

Id. at 1134 (internal quotation marks omitted). So, for example, the Supreme Court itself in Schneckloth noted that "none" of its prior decisions held that the "Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer questions that were put." 412 U.S. at 226–27. While that is a factor to be considered, it is not in and of itself "determinative." Id. at 227. Finally, a court must "bear in mind that the voluntariness of a confession cannot be equated to the absolute absence of intimidation . . . for under such a test virtually no statement would be voluntary because very few

people give incriminating statements in the absence of official action of some kind." Wertz, 625 F.2d at 1134 (internal quotation marks and internal citation omitted) (citing Schneckloth, 412 U.S. at 224).

Here, as discussed above, the language, demeanor, and actions of the investigators when they were in Defendant's residence on August 28, 2015, were calm and nonthreatening. The tenor of the entire interaction between the investigators and Defendant remained conversational. There was never any physical contact between investigators and Defendant. Throughout their interactions with Defendant, the investigators kept their weapons holstered, did not threaten Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner. Moreover, in the signed consent to search forms, Defendant attested that, among other things, his consent was being given freely and voluntarily and without threats, promises, or coercion. (Gov't Ex. A). Similarly, Defendant disclaimed the money seized by signing a Disclaimer of Ownership form, which was also in English and Spanish. (Gov't Ex. B). The form acknowledged, among other things, that Defendant's statements were being made freely and voluntarily and that no promises, threats, or coercion had been used against him.

Defendant was no young simpleton, suffering from a physical or mental defect, or inexperienced with the criminal justice system. Defendant graduated from high school in Phoenix, Arizona, and he was almost 39 years old when he was interviewed at his residence on August 28, 2015. Defendant also reported to Pretrial Services that he owned a produce company. Defendant also reported that he is in excellent physical health with no medical problems reported. According to the Pretrial Services Report, which relied on the U.S. Marshal's booking packet, Defendant indicated no history of mental health treatment, substance abuse history, or substance abuse treatment. The Pretrial Services Report also revealed that Defendant had

numerous contacts with law enforcement between June 1998 and July 2015, approximately 14 interactions with law enforcement in California and Arizona that resulted in his arrest, and 4 of which resulted in a conviction.

Following the principles laid down by the Supreme Court and the Fourth Circuit, and considering the totality of the circumstances, including Defendant's characteristics, the setting of the interview, and the details of the interrogation, the Court finds that Defendant's confession was not induced by such duress or coercion, express or implied, that his will was overborne and his capacity for self-determination critically impaired. He did not request an attorney at any time, and nothing suggests that Defendant would not have made the incriminating statements had he been given a Miranda warning on August 28, 2015. Indeed, Defendant made numerous incriminating statements on April 15, 2016, even <u>after</u> having been advised of his Miranda rights. In sum, Defendant's confession was the product of a rational intellect and a free will. Therefore, the Court finds that Defendant's statements were voluntarily made.

### c. Defendant's Argument that Investigators Unlawfully Tracked His Cellular Telephone

Defendant next argues that investigators unlawfully tracked his cellular telephone. Defendant's argument is without merit.

Under the Supreme Court's decision in <u>Carpenter v. United States</u>, a defendant maintains a reasonable expectation of privacy in the record of his physical movements captured by his cell-site location information. 138 S. Ct. 2206, 2221 (2018). This expectation of privacy implicates the Fourth Amendment. Therefore, the government generally needs a warrant or court order to acquire the defendant's cell-site location information. Here, Special Agent Casey Drake of the North Carolina State Bureau of Investigation ("SBI") applied for and obtained an order from

North Carolina Superior Court Judge Thomas Davis on April 13, 2016, authorizing the installation and monitoring of a pen register and/or trap and trace device on Defendant's known cellphone number, 828-490-3588, which appeared on the labels for the intercepted parcels and which Brenda gave to investigators as a contact number for Defendant. (Gov't Ex. C). As such, investigators tracked Defendant's cellular telephone pursuant to a lawfully obtained warrant. Therefore, this claim is without merit.

### 2. Defendant's Statements on April 15, 2016

### a. Defendant's Argument that He Was Subject to Custodial Interrogation on April 15, 2016

Defendant next argues that he was subjected to custodial interrogation at the Charlotte-Douglas International Airport on April 15, 2016, without first having been advised of his Miranda rights in violation of the Fifth Amendment. Defendant's argument is without merit.

The Government concedes, and the Court finds, that Defendant was subjected to custodial interrogation on April 15, 2016. As the Government notes, however, Defendant was indeed advised of his Miranda rights before any questioning about his criminal activities. More specifically, investigators approached Defendant at the Charlotte-Douglas International Airport on April 15, 2016, confirmed his identity, and arrested him on the outstanding State warrant. Agent Hammond of HIS retrieved two suitcases that Defendant checked with the airline and then Defendant and his belongings were taken to the CMPD Airport Division office in the airport. Defendant told investigators that he speaks and understands English. Agent Hammond told Defendant that TFO Cabarcus, who was also present, speaks Spanish and could assist him with any questions or statements he wished to make. Defendant stated that he understood. Agent Hammond advised Defendant of his Miranda rights verbally and Defendant followed along on a

pre-printed HSI Miranda form. (Gov't Ex. D). Defendant indicated that he understood his rights and wished to waive them in order to answer questions and make statements. Defendant signed the waiver of rights portion of the Miranda form in which Defendant acknowledged that he had his Miranda rights read and explained to him, and that he fully understood his rights. Thus, Defendant was clearly advised of his Miranda rights orally and in writing before being subjected to a custodial interrogation.

### b. Defendant's Argument that His Statements on April 15, 2016, Were Involuntary

Defendant next argues that his statements made on April 15, 2016, were involuntary. For the following reasons, Defendant's argument is without merit.

As discussed above, Agent Hammond advised Defendant of his Miranda rights verbally and Defendant followed along on a pre-printed HSI Miranda form. Defendant indicated that he understood his rights and wished to waive them in order to answer questions and make statements. Defendant signed the waiver of rights portion of the Miranda form in which Defendant acknowledged that he had his Miranda rights read and explained to him; that he fully understood his rights; that he was freely and voluntarily waiving those rights; and that he did so without threat or intimidation and without any promise of reward or immunity. As discussed above, Defendant then made various statements to the investigators about his role in the money laundering scheme.

Throughout their interactions with Defendant on April 15, 2016, the investigators kept their weapons holstered, made no threats to Defendant, made no attempts to coerce him in any way, and always conversed with Defendant in a casual manner. The language, demeanor, and actions of the investigators when they were interviewing Defendant were calm and non-threatening. The tenor of the interactions between the investigators and Defendant remained

conversational. No guns were drawn. Defendant was handcuffed, but he had been arrested. No one ordered Defendant to do anything. There was never any physical contact between investigators and Defendant, other than when they handcuffed Defendant after his arrest. Defendant's interactions with the investigators during his interviews were decidedly casual, non-hostile, and non-coercive.

The fact that Defendant was never threatened or coerced during his interactions that day with investigators is demonstrated by the forms he signed during his interactions with investigators. For example, when Defendant signed the pre-printed HSI Miranda form, waiving his rights and agreeing to answer questions, Defendant acknowledged that he was freely and voluntarily waiving those rights and that he did so without threat or intimidation and without any promise of reward or immunity.

Similarly, when Defendant signed the Department of Homeland Security Computer Forensics consent form consenting to the search of his devices, he acknowledged that he was consenting voluntarily and that he had not been threatened, placed under duress, or promised anything in exchange for his consent.

In sum, after considering the totality of the circumstances, Defendant's confession was induced by such duress or coercion, express or implied, that his will was overborne and his capacity for self-determination critically impaired. Thus, Defendant's statements on April 15, 2016, were voluntarily made.

### c. Defendant's Argument that Investigators Unlawfully Searched His Cellular Telephone

Defendant next argues that investigators unlawfully searched his cellular telephone. Defendant's argument is without merit. The Fourth Amendment guarantees the right of the

people to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. A

warrantless search is "per se unreasonable" subject to "specifically established and well-

delineated exceptions." <u>Schneckloth</u>, 412 U.S. at 219. As the Supreme Court recognized in

<u>Schneckloth</u>, one of the specifically established and well-delineated exceptions to the warrant

requirement is a consent search. <u>Id.</u> Consent searches, when properly conducted, are a

"constitutionally permissible and wholly legitimate aspect of effective police activity." <u>Id.</u> at

228. They often arise:

> under informal and unstructured conditions. The circumstances that prompt the
> initial request to search may develop quickly or be a logical extension of
> investigative police questioning. The police may seek to investigate further
> suspicious circumstances or to follow up leads developed in questioning persons
> at the scene of a crime.

<u>Id.</u> at 231–32. Stated another way, they often arise in situations where police have "some

evidence of illicit activity but lack probable cause to arrest or search." <u>Id.</u> at 227. A consent

search allows police to obtain "important and reliable evidence." <u>Id.</u>

Here, investigators seized two Apple iPhones and an LG Tablet that were both in

Defendant's possession. Defendant consented to a search of the devices in writing. More

specifically, Defendant signed a Department of Homeland Security Computer Forensics consent

form consenting to the search of his devices. (Gov't Ex. E). As documented in the form,

Defendant stated that he understands English, was able to communicate with investigators, that

he read the form, that it was read to him, and that he understood it. In signing the form,

Defendant acknowledged that he had been informed of his right to refuse to consent to the

search, that any contraband or evidence found on the devices may be used against him in a court

of law, and that he understood that he may withdraw his consent at any time for any reason.

In signing the form, Defendant also stated that he was consenting voluntarily and that he had not been threatened, placed under duress, or promised anything in exchange for his consent. Defendant, who was cooperative throughout his interactions with investigators, even provided investigators with the passwords for each device.

In any event, although Defendant consented to a search of his devices, including his cellular telephone, DEA TFO Morgan sought and obtained a warrant from North Carolina Superior Court Judge Alan Thornburg on April 22, 2016, to search the devices. (Gov't Ex. F). As such, regardless of Defendant's consent, investigators searched Defendant's devices pursuant to a lawfully obtained warrant.

## III.    CONCLUSION

In sum, Defendant's motion is untimely and was waived by Defendant. Thus, for that reason alone, the Court will deny Defendant's motion to suppress.

In the alternative, if the Court were to reach the merits of Defendant's suppression motion, the Court would nonetheless find that there was no constitutional violation. First, the Court finds that Defendant was not subjected to custodial interrogation on August 28, 2015, and, thus, Miranda did not apply. Defendant's confession on August 28, 2015, was voluntarily given. Investigators tracked Defendant's cellular telephone pursuant to a lawfully obtained warrant. Second, Defendant was advised of his Miranda rights before his custodial interrogation on April 15, 2016. Defendant's confession on April 15, 2016, was voluntarily given. Defendant consented to a search of his cellular telephone, and investigators searched the cellular telephone pursuant to a lawfully obtained warrant.

As such, the motion to suppress is denied.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress, (Doc. No. 33), is **DENIED**.

Signed: December 2, 2021

Max O. Cogburn Jr.
United States District Judge