UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:16-cr-136-MOC-WCM-1

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | )<br>)<br>)<br>) |
| Vs. | ) MEMORANDUM OF DECISION<br>) AND VERDICT<br>) |
| **UILFRIDO LOPEZ,** | )<br>)<br>) |
| Defendant. | ) |

**THIS MATTER** came before the Court after a bench trial. Before conducting the bench trial, the Court conducted an inquiry under Rule 23, Federal Rules of Criminal Procedure, during which it made inquiry of Defendant and determined that his waiver of a jury trial was knowing, willful, and voluntary. Under the second prong of Rule 23, the Government also consented to a bench trial. The Court then determined under the gatekeeper function of Rule 23 that a bench trial would be conditionally allowed.

Trial commenced on April 4, 2022, and concluded that day. The parties stipulated that the evidence presented for Defendant's prior motion to suppress, including the evidence presented at the suppression hearing, was admissible for the bench trial, and the parties did not produce any additional evidence at the bench trial. After hearing arguments of counsel, the Court announced its Verdict of guilty, and the Court now enters this Memorandum of Decision supporting that verdict.

### FINDINGS AND CONCLUSIONS

**I.  Background**

Defendant was indicted in this district on November 15, 2016, on one count of Operating

-1-

an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) and two counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The parties stipulated at the beginning of the trial that the evidence presented at Defendant's suppression motion hearing would be admissible at trial. Based on this stipulation, the Government stated that it would not call any witnesses for the bench trial, but that it would instead rely on the evidence produced for the motion to suppress, including the witness statements from the motion to suppress hearing. Defense counsel also stated that Defendant would rely on the evidence presented for the motion to suppress. In reaching its Verdict in this case, the Court therefore relies on and recounts here the evidence submitted for the suppression motion and the findings made in the Court's Order denying Defendant's motion to suppress, as follows:

In August 2015, federal, state, and local law enforcement agencies conducted Operation "Edneyville Express" under the leadership of the Organized Crime Drug Enforcement Task Force ("OCDETF"). The long-term investigation led to several indictments of various crystal methamphetamine ("meth") traffickers who were part of an extensive distribution network in the Western District of North Carolina. One of the remaining targets of OCDETF Operation "Edneyville Express" in August of 2015 was Jesus Calderon, also known as "Chewy," who resided in the Western District and reportedly received shipments of crystal meth from associates in the Los Angeles, California area.

On August 28, 2015, Postal Inspector Teresa Cabrera of the United States Postal Inspection Service ("USPIS") and members of the Los Angeles Sheriff Department's Parcel and Cargo Narcotics Enforcement Team ("LASD PACNET") at Los Angeles International Airport ("LAX"), including Detectives McBride, Logrecco, Tagaloa, and Sergeant Nava, conducted a routine random parcel profiling at the airport. Two parcels were flagged as suspect. They bore the

same sender and recipient information, leading investigators to suspect that they contained contraband that had to be broken up and sent in multiple packages. Inspector Cabrera checked the return address of 368 Chestnut St., Saluda, NC 28773 and found that the address did not exist.

Inspector Cabrera checked the intended recipient's address of 5004 E. 59 P., Apt. E, Maywood, CA 90270 and found that, while the address did exist, it was not associated with the intended recipient Defendant Uilfrido Lopez. Detective McBride's narcotic detection canine JerryLee conducted a separate and independent exam of each parcel and gave a positive alert to each parcel, indicating the presence of a narcotic odor emanating from each parcel. The return addressee was listed as Jesus Calderon—believed to be a reference to Calderon—on each parcel.

Inspector Cabrera and the investigators from LASD PACNET then went to the intended recipient's address in Maywood, California to conduct a knock and talk. As Detective Logrecco approached the door to the residence, he noticed that there was a surveillance camera next to the front door and advised the other investigators of what he observed. Detective Logrecco knocked and Defendant answered the door. Defendant admitted he was "Lopez."

Detective Logrecco asked Defendant for his identification. Defendant went to retrieve his identification but left the front door open, allowing Detective Logrecco to observe a UPS box in the residence's hallway. Defendant returned to the front door of the residence and presented a Mexico Consulate card to verify his name. Detective Logrecco asked Defendant if the investigators could enter the residence to speak to him about the two parcels they intercepted earlier that day at LAX. Defendant consented to investigators entering his residence to speak with him about the two parcels. Inspector Cabrera noticed in plain view a money counter on top of a safe in the living room, four heat-sealed bags containing U.S. currency next to the safe, and two rolls of plastic wrap.

Inspector Cabrera also noticed that there were surveillance cameras next to the U.S. currency and in the kitchen of the residence. Detective Logrecco told Defendant to be honest and that, based on what investigators observed in the residence, they believed that there was money in the intercepted parcels. Defendant admitted that each of the parcels contained U.S. currency. Defendant initially claimed the parcels were mailed to him and that he was supposed to count out the money. Once he collected $300,000, he would make a call and someone would pick the money up from him.

Defendant admitted that he collected $300,000 in the past and that a "Mexican" picked it up. Inspector Cabrera asked Defendant for consent to search the parcels to verify their contents. Defendant consented to a search of the parcels orally and in writing. The written Consent to Search form, which was in English and Spanish, acknowledged that Defendant had been informed of his constitutional rights not to have a search made of the parcels without a search warrant and his right to refuse consent to search the parcels; that he understood his right to withdraw his consent; and that his consent was being given freely and voluntarily, and without threats, promises, or coercion. (Gov't Ex. A).

Investigators opened the parcels and confirmed that they contained U.S. currency. One parcel contained $70,000 in U.S. currency, and the other parcel contained $40,000 in U.S. currency. The $70,000 parcel was packaged in the following manner: 5 vacuum-sealed bags (each containing 7 bundles of U.S. currency in rubber bands); inside a food saver bag wrapped in black tape, foil, plastic wrap, auto grease, plastic, carbon paper, plastic wrap, carbon paper, plastic wrap, another food saver bag, two layers of plastic wrap, and shipping tape. The $40,000 parcel was packaged in the following manner: a food saver bag containing 4 bundles of U.S. currency in rubber bands, wrapped in plastic wrap, carbon paper, auto grease, black tape, pepper, more plastic

wrap, inside a vacuum sealed bag, and wrapped in more plastic wrap. The packaging of each—especially the use of foil, carbon paper, pepper, and auto grease—indicated that steps were taken to prevent discovery of the money by a narcotics detection canine.

Defendant, who was never handcuffed during his interaction with investigators at his residence, admitted he had been accepting parcels containing money for the past several months. Defendant admitted that he received a 4% commission as payment for accepting the parcels. Defendant was asked if there were any drugs in the residence. Defendant denied that there were any drugs in the residence and said the investigators could check the residence. Defendant signed a consent form allowing investigators to search his residence. Detective McBride ran JerryLee through the residence. JerryLee alerted to the 4 heat-sealed bags of U.S. currency, indicating that the odor of narcotics was emanating from the bags of money.

During the ensuing search, investigators located a backpack containing the mailing receipt for the seized parcels, leading investigators to suspect that not only was Defendant going to receive the seized parcels, but that he also sent them from North Carolina. Defendant, upon investigators finding the receipt, admitted that he had flown to North Carolina, was given the money, and that he then packaged the parcels himself and mailed them to California. Inspector Cabrera asked Defendant if his fingerprints would be on the inside of the parcels. Defendant responded "yes." The continuing search turned up packing materials, plastic wrap, boxes, a scale, and labels and receipts from other parcels that were sent. When asked, Defendant would not explain why the materials were in his residence. When asked by Inspector Cabrera about the different names on the labels for other parcels, Defendant stated that he just makes up the names in order to mail the parcels.

Investigators also seized the 4 heat-sealed bags containing U.S. currency that they

observed in the residence. Three bags (each containing 7 bundles of U.S. currency in rubber bands) and 1 bag (containing 6 bundles of U.S. currency in rubber bands) contained a total of $43,000 in U.S. currency. Defendant disclaimed the money seized by signing a Disclaimer of Ownership form, which was in English and Spanish. (Gov't Ex. B). The form acknowledged Defendant was not the owner of the property seized; that there was probable cause that the property seized was acquired in violation of 21 U.S.C. § 841 (Distribution of Controlled Substances); that Defendant had no interest in the property seized; and that Defendant's statements were being made freely and voluntarily and that no promises, threats, or coercion had been used against him. Defendant provided a contact number that was the same contact number listed for the intended recipient on the labels for the parcels seized at LAX. Throughout their interactions with Defendant that day, investigators kept their weapons holstered, did not threaten Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Defendant told investigators that he lived in the residence with his girlfriend, Brenda Cabrera. As investigators were leaving the residence, they observed a vehicle pull into the parking spot for the residence. Inspector Cabrera approached the female driver and asked if she was Brenda Cabrera. The driver confirmed that she was. When informed of the items seized from the residence and when asked if she had any interest in the property, Brenda explained that she recently broke up with Defendant and was just there to just pick up some glasses. Brenda also signed a Disclaimer of Ownership form, which was in English and Spanish. The form acknowledged that Brenda was not the owner of the property seized; that there was probable cause that the property seized was acquired in violation of 21 U.S.C. § 841 (Distribution of Controlled Substances); that Brenda had no interest in the property seized; and that Brenda's statements were

-6-

being made freely and voluntarily and that no promises, threats, or coercion had been used against her. When Inspector Cabrera asked Brenda for a contact number for Defendant, Brenda provided a number that was the same contact number listed for the sender on the labels for the parcels seized at LAX. A narcotics detection canine conducted a separate and independent exam of each bag of U.S. currency seized from Defendant's residence later that same day and gave a positive alert to each bag, indicating the presence of a narcotic odor emanating from each bag.

On March 2, 2016, and March 3, 2016, investigators interviewed a known meth trafficker after his arrest as part of OCDETF Operation "Edneyville Express." The trafficker told investigators, among other things, that Jesus Calderon is the largest meth dealer in the area; that Calderon obtains his meth through parcels shipped via the U.S. Postal Service, Fed Ex, and UPS; and that he takes receipt generally at the post office in Flat Rock, North Carolina. The trafficker also described how a "money man" travels from California to the Hendersonville, North Carolina area approximately twice a month to meet with Calderon and retrieve narcotics proceeds. The trafficker described the "money man," and the description was similar to the known description for Defendant. The trafficker further explained that the "money man" normally flies to Charlotte and then drives to the Hendersonville area by car; the "money man's" trips to North Carolina are short–arriving in and departing from the Hendersonville area the same day, or staying overnight at an area hotel or some cabins in the Saluda area (believed to be a reference to "Cabin Fever," which offers cabin rentals just off of Interstate 26 in Saluda, North Carolina); and the "money man" moves drug money for a living. Finally, the trafficker identified a dated picture of Defendant as potentially being the "money man."

On April 13, 2016, American Airlines notified investigators that Defendant purchased a ticket from Los Angeles, California to Charlotte, North Carolina, with Defendant departing

-7-

Case 1:16-cr-00136-MOC-WCM   Document 56   Filed 05/06/22   Page 7 of 15

Los Angeles on the evening of April 12, 2016, and arriving in Charlotte in the early morning hours of April 13, 2016. Special Agent Casey Drake of the North Carolina State Bureau of Investigation ("SBI") applied for and obtained an order from North Carolina Superior Court Judge Thomas Davis on April 13, 2016, authorizing the installation and monitoring of a pen register and/or trap and trace device on Defendant's known cellphone number, which appeared on the labels for the intercepted parcels and which Brenda gave to investigators as the contact number for Defendant. (Gov't Ex. C).

On April 14, 2016, investigators were attempting to locate Defendant using the trap and trace on Defendant's cellphone when his cellphone was detected at approximately 7:57 p.m. near "Cabin Fever," a complex of vacation rental cabins in Saluda, NC. An investigator went to that location but could not locate Defendant. By 10:00 p.m., Defendant's phone was detected near Charlotte-Douglas International Airport. Investigators knew that the last direct flight from Charlotte, North Carolina to Los Angeles, California that evening would be departing at 10:20 p.m. Defendant had an outstanding State warrant for his arrest out of Cleveland County, North Carolina.

Task Force Officer ("TFO") Aaron Lisenbee of the United States Drug Enforcement Administration ("DEA") enlisted the assistance of Homeland Security Investigations ("HSI") to locate and stop Defendant within the airport before he could board the plane. Special Agent Jason Allen of HSI determined that Defendant missed the flight and rescheduled his flight to LAX for the following morning.

On April 15, 2016, HSI Special Agent Mark Hammond, HSI TFO Nestor Cabarcus, who was also a Charlotte-Mecklenburg Police Department ("CMPD") Officer, and HSI TFO Todd Bradshaw, who is also a Pineville Police Canine Handler, conducted surveillance in the gate area

of the LAX flight as it was preparing to board. Agent Hammond observed Defendant standing in line near the jet way. The investigators approached Defendant, confirmed his identity, and arrested him on the outstanding State warrant, placing him in handcuffs. Agent Hammond retrieved two suitcases that Defendant checked with the airline and then Defendant and his belongings were taken to the CMPD Airport Division office in the airport.

Defendant told the officers that he speaks and understands English. Agent Hammond told Defendant that TFO Cabarcus speaks Spanish and could assist him with any questions or statements he wishes to make. Defendant stated that he understood. Agent Hammond then advised Defendant of his Miranda rights verbally, and Defendant followed along on a pre-printed HSI Miranda form. (Gov't Ex. D). Defendant indicated that he understood his rights and wished to waive them in order to answer questions and make statements. Defendant then signed the waiver of rights portion of the Miranda form, in which Defendant acknowledged that he had his Miranda rights read and explained to him; that he fully understood his rights; that he was freely and voluntarily waiving those rights; and that he did so without threat or intimidation and without any promise of reward or immunity.

Defendant consented to a search of his carry-on and checked luggage. Before any search, TFO Bradshaw used his narcotics detection canine Rafa to conduct an open-air sniff of Defendant's bags. Rafa alerted to the presence of a narcotic odor emanating from the bags. A search of the checked luggage led to the seizure of $62,860 in U.S. currency. Two bundles of money were wrapped in cellophane and concealed inside a pair of shoes. Two additional bundles of money in bank bags were concealed in the liner of one of the pieces of luggage. An ion scan of the money bundles seized tested positive for traces of meth and cocaine. Investigators also located a drum magazine capable of holding 75 rounds of 7.62 caliber ammunition and a flash

-9-

drive in Defendant's luggage.

Finally, investigators seized two Apple iPhones and an LG Tablet in Defendant's possession. Defendant consented to a search of the devices in writing. More specifically, Defendant signed a Department of Homeland Security Computer Forensics consent form consenting to the search of his devices. (Gov't Ex. E). As documented in the form, Defendant stated that he understands English, was able to communicate with investigators, that he read the form, that it was read to him, and that he understood it. In signing the form, Defendant acknowledged that he had been informed of his right to refuse to consent to the search, that any contraband or evidence found on the devices may be used against him in a court of law, and that he understood that he may withdraw his consent at any time for any reason.

In signing the form, Defendant also stated that he was consenting voluntarily and that he had not been threatened, placed under duress, or promised anything in exchange for his consent. Defendant, who was cooperative throughout his interactions with investigators, even provided investigators with the passwords for each device.

When questioned, Defendant stated that he was traveling to Los Angeles, California, but that he lives in Mexicali, Mexico. Defendant explained that he traveled to Charlotte to pick up bags of money, but that he did not know how much money he was supposed to pick up. He stated that "Chewy" (believed to be a reference to Calderon) placed the money in his car the night before while his car was parked at the Airport Sheraton near Charlotte-Douglas International Airport.

Defendant further explained that he was supposed to be paid 4% of the money he was transporting and that he was to deliver the money to "Rosie" in Los Angeles. Defendant denied having any contact information for Rosie and claimed that she would call him after he arrived in

-10-

Los Angeles to arrange for the delivery of the money. Defendant claimed that this was the first time he ever moved money between Chewy and Rosie. He stated that that "Ezekiel," who lives in Mexico, got him involved in moving money. Ezekiel approached him with the idea and gave him the money to pay for his airfare.

Defendant abandoned the money seized via a Department of Homeland Security Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise form. Throughout their interactions with Defendant, investigators kept Defendant handcuffed, except for removing or adjusting the handcuffs briefly to allow Defendant to sign documents. Investigators also kept their weapons holstered, did not threaten Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Defendant also consented to an interview that same day with DEA TFO Chris Morgan and Internal Revenue Service ("IRS") Special Agent Rob Key, who were involved in the larger investigation. Defendant changed some of the details of his earlier version of events. He explained to them that he flew out of LAX on April 12, 2016, and arrived in Charlotte, North Carolina on April 13, 2016. He paid cash for his plane ticket. He stated that "Ezekiel" tells him when to travel to North Carolina to pick up money. Ezekiel tells him where to stay, how to pick up the money, and what to do with it once he gets back to Los Angeles. When he got back to Los Angeles this time, he was supposed to call "Rosa." Rosa would tell him what vehicle to put the money in at the Downey Mall near LAX. Then Defendant would travel to Mexico. Once in Mexico, he would receive a 4% commission on the amount of money picked up and delivered.

Regarding the current trip, Defendant explained that once he and his girlfriend, Victoria Hernandez-Ramos, got to Charlotte, they rented a car and drove to Saluda. Once there, they rented a cabin at "Cabin Fever." He left the rental vehicle unlocked overnight as instructed.

-11-

"Chewy" (believed to be a reference to Calderon) dropped the money off in the early morning hours. Defendant confirmed the money was in the rental vehicle the next morning when he woke up, on April 14, 2016. Defendant and Hernandez-Ramos drove back to Charlotte later that day but missed their flight to LAX. They stayed overnight at the Sheraton and returned to the airport on April 15, 2016, to take the early flight to LAX. That is when he was stopped by HSI. Hernandez-Ramos boarded the plane and flew back to Los Angeles.

Defendant explained that he and his brother used to live in Laurel Park, North Carolina and worked in a local factory. Ezekiel used to have a driver with a tractor trailer that would deliver drugs to North Carolina. However, the driver was arrested in the Summer of 2015. Ezekiel then asked Defendant to travel to North Carolina to retrieve money. Defendant admitted that he knew the money he picked up, and was caught transporting, was drug proceeds. He also admitted that he knew what he was doing was illegal. Finally, Defendant acknowledged the earlier seizure in California, explaining that this was the second time he had money seized from him, with the first seizure taking place at his residence in California. Throughout their interactions with Defendant, the investigators kept their weapons holstered, made no threats to Defendant, made no attempts to coerce him, and always conversed with Defendant in a casual manner.

Although Defendant consented to a search of his devices, including his cellphones, TFO Morgan sought and obtained a warrant from North Carolina Superior Court Judge Alan Thornburg on April 22, 2016, to search the devices. (Gov't Ex. F). When executing the warrant, investigators found photographs of large quantities of meth, marijuana, U.S. currency, firearms, and scales on one of Defendant's cellphones. Some of the photos were taken in Defendant's California residence.

Investigators found no evidence indicating that Defendant or Calderon had a legitimate

-12-

Case 1:16-cr-00136-MOC-WCM  Document 56  Filed 05/06/22  Page 12 of 15

reason to be dealing in large quantities of U.S. currency. North Carolina and California employment checks produced no record of employment for Defendant. Calderon reportedly worked at a local factory in Hendersonville, North Carolina in 2015 and/or 2016, but he had never earned more than $38,000 annually. A check of the bank account where Calderon's employment checks were deposited showed a single $20 withdrawal during a seven-month period, leading investigators to suspect that he was using money earned from his narcotics trafficking activities to pay his living expenses.

## II.     Standard Applicable to Bench Trials

When a case is tried without a jury, Rule 23(c) provides that the court "must find the defendant guilty or not guilty." FED. R. CRIM. P. 23(c). The Rule further states that "[i]f a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." FED. R. CRIM. P. 23(c). While neither party asked, the Court believes that a written summary of the Court's findings underlying its verdict will aid further review.

In a bench trial, a court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable. Penn–Texas Corp. v. Morse, 242 F.2d 243, 247 (7th Cir. 1957); Latimer v. Washington Gas Light Co., 2012 WL 2119254 (E.D. Va. 2012). Sitting as the finder of fact, a trial court may disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 567 (4th Cir. 1995). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. Burgess v. Farrell Lines, Inc., 335 F.2d 885, 889 (4th Cir. 1964). In the end, Rule 23(c) requires that a judge sitting without a

-13-

Case 1:16-cr-00136-MOC-WCM    Document 56    Filed 05/06/22    Page 13 of 15

jury must do more than announce statements of ultimate fact. United States ex rel. Belcon, Inc. v. Sherman Constr. Co., 800 F.2d 1321, 1324 (4th Cir. 1986) (applying bench trial standard in civil context). The court must support its rulings by referencing the facts on which it relies. Id. In the end, this Court must be convinced of a defendant's guilt beyond a reasonable doubt based on all the evidence presented.

### III. Discussion

Mindful of the Court's duty under Rule 23(c) when it is also the trier of fact, the discussion that follows is intended to highlight the evidence that informed the Court's Verdict. It is not intended to be an unabridged recounting of all the evidence presented, which is found in the record.

Defendant is charged with one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) (Count One), and two counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (Counts Two and Three). As the Court stated in open Court at the bench trial, the Court finds that the Government has met its burden of proving each and every element of each of these offenses beyond a reasonable doubt and enters a verdict of guilty on Count 1, Count 2, and Count 3.

### IV. Conclusion

The Court finds that Defendant is **GUILTY** of one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) and two counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). For the foregoing reasons and based on all the evidence presented at trial, the Court enters the following Verdict after a bench trial.

### VERDICT

The Court finds, based on all the testimony and evidence presented, as follows:

1. That Defendant is **GUILTY** of one count of Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960(a) and two counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Signed: May 6, 2022

Max O. Cogburn Jr
United States District Judge